998 So.2d 448 (2008)
Mary Ann Griffin (STONE), Appellant
v.
LEA BRENT FAMILY INVESTMENTS, L.P., Appellee.
No. 2007-CA-01168-COA.
Court of Appeals of Mississippi.
December 16, 2008.
*450 John J. Crow, Jr., Water Valley, attorney for appellant.
Athan P. Adams, Jr., Greenville, attorney for appellee.
Before KING, C.J., GRIFFIS and CARLTON, JJ.
CARLTON, J., for the Court.
¶ 1. On February 17, 2006, Lea Brent Family Investors, L.P. (Trust) filed a complaint in the Washington County Circuit Court seeking a permanent injunction to enjoin Mary Ann Griffin Stone from blocking access to an easement granted to the Trust by a warranty deed. In response, Stone claimed she had extinguished any rights the Trust had in the easement through adverse possession. Additionally, Stone argued that the Trust had abandoned the easement. The case was tried in the Chancery Court of Washington County on June 14, 2007.
¶ 2. The chancellor entered a judgment for the Trust finding that the easement had neither been adversely possessed nor abandoned. As a result, the chancellor issued an injunction ordering Stone to grant the Trust access to its easement. Stone appeals the chancellor's judgment alleging that the chancellor erred in ruling that: (1) Stone had failed to adversely possess the easement for the required statutory period of ten years, and (2) the Trust had not abandoned the easement. We affirm the chancellor's judgment in favor of the Trust but do so on different grounds.

FACTS AND PROCEDURAL HISTORY
¶ 3. The subject of this appeal is whether the Trust still has an easement in the driveway on Stone's property in Washington County, Mississippi. The driveway runs from east to west across Stone's land. The entrance of the driveway is on the east side and the end of the driveway is on the west side. Edwin Lea Brent (Brent)[1] *451 owns about five to ten acres next to the west side of the driveway. Brent testified that the most accessible way to reach this land is by using Stone's driveway, which is where his easement is located. On June 26, 2007, the chancellor enjoined Stone from preventing Brent from using the easement in her driveway to get to his land. The chancellor found that the easement was neither adversely possessed by Stone nor abandoned by Brent.
¶ 4. Brent's chain of title to the easement consists of six instruments, all of which were properly recorded and entered into evidence at trial. The chain of title shows that beginning in late 1962 and up to the latest deed dated 1996, all six instruments have included the following provision: "Provided, however, their heirs and assigns, shall have the right of ingress and egress, over and across the [n]orth end of the above described lot [of 3.08 acres] for purpose of having access to other portions of Black Beauty Plantation as herein conveyed."
¶ 5. From 1962 until 1992, the easement, then more of an undeveloped crossing, was used by Brent to access the five to ten acres mentioned above. From 1987 to 1990, Brent, who at the time was an Arabian horse breeder, used the crossing to take oats from his barn to his bins and from his bins back to his horses. In 1990, Brent moved to Colorado, and by 1992, he had moved all of his Arabian horses there.
¶ 6. On February 28, 1991, Stone, as a joint tenant with her now deceased husband, Dr. Richard Griffin, acquired by a warranty deed the 3.08 acre lot subject to Brent's easement. In 1991, the Griffins posted a no trespassing sign at the entrance to the easement. In 1992, the Griffins upgraded the easement and turned it into a driveway using gravel and dirt. The dirt was purchased from Brent. Also in 1992, the Griffins put a gate at the east-side entrance of the driveway. They also installed an ornamental archway over the east-side gate on which the name "Black Beauty Plantation" is prominently displayed. An electric lock was installed on the gate in 1994. Before the Griffins acquired the 3.08 acre lot, a gate at the west end of the crossing had already been installed. In sum, the Griffins turned the crossing into a driveway in 1992, and they have maintained it ever since.
¶ 7. Stone testified that she and Dr. Griffin installed a gate at the east-side entrance when they moved in because they had "a lot of problems" with trespassing hunters. Stone said her husband had specifically told hunters from the Gilknocke Hunting Club not to trespass on their land. Stone also testified that one of their four-wheelers had been stolen before they had installed the east-side gate system. Similarly, Brent testified that Dr. Griffin, also Brent's veterinarian, had complained to Brent that hunters from the hunting club were trespassing onto the Griffins' property.
¶ 8. From 1990 until 2003, Brent traveled back and forth from Colorado to Greenville, Mississippi. By 1992, Brent knew that the Griffins had purchased the 3.08 acre lot which was subject to his easement. He was aware of the no trespassing sign, the east-side gate and the ornamental archway. In 2003, Brent moved back to Greenville. Black Beauty was flooded in late 2004/early 2005. Because of the flooded conditions, Brent wanted to go duck hunting on the portion of his land he could reach by his easement in Stone's driveway. However, when he got to the entrance gate to the driveway, it was locked. Brent then went through Stone's neighbor, Martha Huntley's property to get to his easement in Stone's driveway and to his land.
*452 ¶ 9. The second time Brent tried to access his land to go duck hunting, he again found the entrance gate on Stone's property locked. By this time, Huntley had also started locking her gate. Having trouble getting to his property, Brent then asked Stone "for the clicker to get through the gate" and was told that "[he]'d have to go around." In response, Brent testified that he told Stone, "You can't block the road." At this point, Stone advised Brent to contact her lawyer. Soon afterward, both Stone and Brent had retained counsel regarding Brent's easement.
¶ 10. In the meantime, Stone allowed Brent to go through her entrance gate upon the condition that he would call her first. However, this arrangement soon came to an end when Stone put up a chainlink fence along the length of the driveway and locked the west-side gate at the end of her driveway. At trial Stone testified, "He can use the lane that has been provided for him because that will secure my property and he would have easy access at his own bidding.... Now if he wants to use my driveway, then he would need to contact me."
¶ 11. However, Brent testified that because the land alongside the fence was not paved and was on lower ground, he could not consistently travel on it with a vehicle, especially when the land became flooded. Even Stone admitted as much when she testified: "If he has no way to get across because of a flood, because that field does flood, and he needed to get across, then I would let him get across."
¶ 12. Stone admitted at trial that Brent held an easement in her driveway. She testified that she did not want him using the driveway without her permission. When the chancellor asked Stone if there was any reason why she did not want to give a key to the east-side gate entrance to Brent, Stone replied that for safety purposes she did not want a lot of traffic on her property. She further testified that if Brent would call her before he wanted to use the easement, she would open the gates for him.

DISCUSSION
¶ 13. The Court will not disturb a chancellor's findings if they are supported by substantial evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous, or applied an erroneous legal standard. Sanderson v. Sanderson, 824 So.2d 623, 625-26(¶ 8) (Miss.2002). The "manifest error" standard applies only to findings of fact. Boggs v. Eaton, 379 So.2d 520, 522 (Miss. 1980). "If the chancellor is manifestly wrong in basing his decision upon the facts, then this Court will reverse, otherwise, we will affirm." Id. "This rule does not apply on questions of law." Id. Questions of law are reviewed de novo. Russell v. Performance Toyota, Inc., 826 So.2d 719, 721(¶ 5) (Miss.2002).

I. WHETHER STONE ADVERSELY POSSESSED THE EASEMENT FOR THE REQUIRED STATUTORY PERIOD OF TEN YEARS.
¶ 14. Stone argues in her appeal that she gained title to the easement through adverse possession and/or abandonment. Under Mississippi Code Annotated section 15-1-13 (Rev.2003), adverse possession is defined as follows:
Ten ... years' actual adverse possession by any person claiming to be the owner for that time of any land, uninterruptedly continued for ten ... years by occupancy, descent, conveyance, or otherwise, in whatever way such occupancy may have commenced or continued, shall vest in every actual occupant or possessor *453 of such land a full and complete title....
See also Buford v. Logue, 832 So.2d 594, 601(¶ 16) (Miss.Ct.App.2002). In order to prove title through adverse possession, the claimant must prove that possession was: (1) under claim of ownership; (2) actual or hostile; (3) open, notorious, and visible; (4) exclusive; (5) peaceful; and (6) continuous and uninterrupted for ten years. Rice v. Pritchard, 611 So.2d 869, 871 (Miss. 1992) (citations omitted). To prevail on a claim of adverse possession, the claimant must prove every element by clear and convincing evidence. Buford, 832 So.2d at 600(¶ 15) (citation omitted). The chancellor in this case had the task of applying the six-element test to a dominant and a servient estate. Although we agree with the chancellor's ultimate finding for Brent on the issue of adverse possession, we reach the same conclusion on different grounds.

A. Under Claim of Ownership
¶ 15. To demonstrate a claim of adverse possession, the acts done must be sufficient to fly the flag on the land and keep it flying "so that the (actual) owner may see, and ... he will [know] that an enemy has invaded his domains, and planted the standard of conquest." Simmons v. Cleveland, 749 So.2d 192, 196(14) (Miss.Ct. App.1999) (citation omitted). We note that the application of this element to a servient and a dominant estate requires a more narrow approach than it would in the usual application of "ownership" to two unrelated pieces of land. Brent does not claim ownership of the land on which his easement lies. Rather, he claims the right of ingress and egress over his easement.
¶ 16. The chancellor found that "[Stone] posted no trespassing signs and had an electrified gate placed at the entrance of the crossing" and that "[Stone] eventually fenced in the crossing and put chains and locks on the gates." For these reasons, the chancellor determined there was "substantial evidence of claim of ownership." We agree with the chancellor's findings, but, again, would add that the issue in this case is not about who owned the land where the easement is, but rather, whether Brent had the right to ingress and egress on his easement located in Stone's driveway.

B. Actual Or Hostile
¶ 17. For a claimant to have actual possession, she must have "effective control over a definite area of land, evidenced by things visible to the eye or perceptible to the senses." Sturdivant v. Todd, 956 So.2d 977, 987(¶ 32) (Miss.Ct. App.2007) (quoting Blankinship v. Payton, 605 So.2d 817, 819-20 (Miss.1992)). The concept of possession contains the "intent to exclude others except with the occupant's consent." Id. (quoting Blankinship, 605 So.2d at 820).
¶ 18. The chancellor found that "[Stone] bought dirt and gravel and used the same to turn the crossing into a driveway and that "[Stone] erected a huge wooden archway at the entrance of the crossing on which the name Black Beauty Plantation is displayed." Therefore, the chancellor determined that it "[was] clear that [Stone] actually possessed the disputed crossing." Again, we agree with the chancellor but would point out that the issue in the case is about Brent's right to ingress and egress across his easement; it is not about who actually owned the land where the easement was located.

C. Open, Notorious, And Visible
¶ 19. "[T]itle to real property belonging to another may never be acquired by mere possession, however long continued, ... which is not such as will *454 give unmistakable notice of the nature of the occupant's claim." Cole v. Burleson, 375 So.2d 1046, 1048 (Miss.1979) (citation omitted). "Mere possession does not satisfy the requirement that possession be open, notorious, and visible." Todd, 956 So.2d at 989(¶ 37) (citing Craft v. Thompson, 405 So.2d 128, 130 (Miss.1981)). "[B]oth the quality and quantity of possessory acts necessary to establish a claim of adverse possession may vary with the characteristics of the land." Id. (quoting Lynn v. Soterra, Inc., 802 So.2d 162, 167(¶ 17) (Miss.Ct.App.2001)).
¶ 20. For example, in Walker v. Murphree, 722 So.2d 1277, 1281-82 (¶¶ 16-20) (Miss.Ct.App.1998), the Court found that when Walker stored junk cars on Murphree's land, occasionally parked two eighteen-wheelers on Murphree's land, and mowed the same propertyWalker had failed to prove that he had come to adversely possess the land because Murphree had not been put on notice by such acts. However, the Court found that when Walker put homes on Murphree's property, that Walker's action constituted "notice of such kind and quality that it placed Murphree on notice of Walker's claim to the property, and Murphree took action." Id. at 1282 (¶ 18).
¶ 21. Regarding obstructions such as gates, as early as 1918 the Mississippi Supreme Court has held that when determining whether an obstruction such as a gate is a "practical hindrance" or an "unreasonable obstruction" depends upon the facts of each case. Bd. of Trs. of Univ. of Miss. v. Gotten, 119 Miss. 246, 255, 80 So. 522, 523 (1918). "If it appears that the erection of gates will not unreasonably interfere with the enjoyment of the easement, it is our opinion that the owner of the servient estate is justified in erecting gates." Id. "Generally speaking, every owner of lands has a perfect right to fence them, provided, of course, to do so will not appreciably interfere with vested rights of others." Id.
¶ 22. Similarly, in Dunaway v. Busbin, 498 So.2d 1218, 1221-22 (Miss.1986), the supreme court held that when the Dunaways built a six-to-eight foot fence across the Busbins' right-of-way, that it unreasonably obstructed the Busbins' right-of-way. The obstruction was unreasonable because the Dunaways could not enter the right-of-way "without either climbing over the fence or tearing it down." Id. at 1221.
¶ 23. Here, the chancellor found that Stone had proved by clear and convincing evidence that she had treated Brent's easement as her own in an open, notorious and visible manner. The chancellor wrote: "[Stone's] driveway, gate, and wooden archway were visible to [Brent] for [twelve] years. Brent testified that when he saw these things he knew this was done to keep the public out. He just didn't think it applied to him! Thus, this requirement is satisfied." However, the chancellor later noted in her opinion that "[Stone's] possession of her `driveway' was not adverse to [Brent's] easement until 2004/2005 when [Brent] was refused access."
¶ 24. We find, unlike the chancellor, that Stone did not satisfy the element of "open, notorious, and visible" possession of Brent's easement because, as the chancellor later stated in her opinion, no action taken either by the Griffins or by Stone, acting solely, was adverse to Brent until 2004/2005 when Stone refused to grant Brent access to his easement. Shortly thereafter, Brent brought suit to quiet title to his easement. See Walker, 722 So.2d at 1282(¶ 18) (stating that when Walker put homes on Murphree's property, that Walker's action constituted "notice of such kind and quality that it placed Murphree on *455 notice of Walker's claim to the property, and Murphree took action").

D. Exclusive
¶ 25. To satisfy the element of exclusivity, "the claimant's conduct must afford an unequivocal indication that he is exercising dominion of a sole owner." Keener Props., L.L.C. v. Wilson, 912 So.2d 954, 957(¶ 6) (Miss.2005) (quoting Lynn, 802 So.2d at 168(¶ 17)). Exclusive use does not mean that no one else uses the land or easement. Moran v. Sims, 873 So.2d 1067, 1069(¶ 10) (Miss.Ct.App.2004). Rather, exclusive use indicates a right to use the land above other members of the general public. Keener, 912 So.2d at 957(¶ 8).
¶ 26. The chancellor noted that "[Stone] constructed the driveway for [the] personal use of her family. It was fenced in and permission to use it from [Stone] was required [in late 2004/early 2005]." Therefore, the chancellor found that Stone had exercised the dominion of a sole owner over her driveway. We state again for the sake of clarity that Stone's ownership or "dominion" of her driveway where the easement is located was never in dispute. What is disputed is whether she adversely possessed Brent's easement, thus, cutting him off from his right to use it.

E. Peaceful
¶ 27. "`Peaceful' is defined as `marked by, conducive to, or enjoying peace, quiet, or calm.'" Biddix v. McConnell, 911 So.2d 468, 477(¶ 25) (Miss.2005) (quoting Webster's Third International Dictionary 1160 (1986)). The chancellor found that "[t]he evidence [was] undisputed that from 1992 until December of 2004 or January of 2005, no one ever contested or disputed [Stone's] possession of the disputed property." The chancellor did not explicitly state that this element was satisfied, however, in accordance with her whole opinion, and the language used above, we can only assume she found it satisfied.

F. Continuous And Uninterrupted for a Period of Ten Years
¶ 28. Under this element, the chancellor specifically analyzed the relationship of Stone's servient estate to Brent's dominant estate in determining that Stone had not adversely possessed Brent's easement for the required statutory period of ten years. The chancellor explained: "In the case of general landowners, if A puts up a gate or fence on B's property, B has clearly been noticed that A is claiming ownership of and is excluding B from B's property." In contrast, the chancellor stated that notice in a situation concerning an easement involving dominant and servient estates would be different. She explained that the servient owner "has the right to use his or her land for any purpose that does not interfere with the enjoyment of the easement."
¶ 29. Our case law has long recognized that putting a gate on one's property is not necessarily indicative of adverse possession. In Gotten, 119 Miss. at 255, 80 So. at 523, the supreme court unequivocally stated: "Generally speaking, every owner of land has a perfect right to fence them, provided, of course, to do so will not appreciably interfere with vested rights of others."
¶ 30. Accordingly, the chancellor found in the case at bar that up until 2004/2005 "[Stone's] use and treatment of the disputed property did not necessarily conflict with [Brent's] easement" because although [Stone's gate] prevented the general public from going across her land, it "still allowed the ingress and egress as contemplated by the easement." The chancellor further stated that "[Stone] took no explicit steps to indicate that she considered the easement *456 at an end ... until December of 2004 at the earliest." The chancellor determined that Stone's possession of the driveway "was not adverse to [Brent's] easement until 2004/2005 when [Brent] was refused access." Therefore, the chancellor found that Stone failed to meet her burden of proof as to possessing the easement at issue for the statutorily required period of ten years.
¶ 31. We find the chancellor's ruling that Stone failed to meet her burden of proof on her claim of adverse possession was supported by substantial evidence and was not manifestly wrong. See Sanderson, 824 So.2d at 625-26(¶ 8). Therefore, we find no error and affirm on this issue.

II. WHETHER BRENT ABANDONED THE EASEMENT.
¶ 32. The chancellor found there was no evidence of intent by Brent to abandon the easement or to repudiate ownership. Abandonment is a question of fact which requires non-use for an extended period of time as well as the intent to abandon Bivens v. Mobley, 724 So.2d 458, 461-62 (¶¶ 11-13) (Miss.Ct.App.1998). Evidence of abandonment must be "full and clear." Columbus & Greenville Ry. Co. v. Dunn, 184 Miss. 706, 720, 185 So. 583, 586 (1939). "[T]here must be some clear and unmistakable affirmative act or series of acts indicating a purpose to repudiate ownership." Id. "`[P]rotracted non-use for an extended period of time'" manifests a "`presumption of abandonment.'" Bivens, 724 So.2d at 461(¶ 11) (quoting R&S Dev., Inc. v. Wilson, 534 So.2d 1008, 1010 (Miss. 1988)). The presumption is stronger if an intent to abandon can be shown. Id. (citation omitted).
¶ 33. For example, in Dunn, the court found that "an intentional abandonment of a right of way by a railway company was shown by its removal of tracks, ties, rails, and bridges, and the neglect and non[-]use[] of the right of way for a period of ten years." Dunn, 184 Miss. at 706, 185 So. at 586. Similarly, in COR Devs., LLC v. College Hill Heights Homeowners, 973 So.2d 273, 286(¶ 33) (Miss.Ct.App.2008), the Court found that non-use of a right-of-way created a presumption of abandonment which would be strengthened by acts of acquiescence and acts inconsistent with the right, such as the placement of a physical obstruction in the user's way. Id. at (¶ 33).
¶ 34. Here, the chancellor found Brent did not use the easement for a "protracted" period of time and that such non-use created a presumption of abandonment. However, after considering all of the evidence, the chancellor found that there was no evidence Brent's intent to abandon his easement. The chancellor explained "there was no act done which was inconsistent with further enjoyment of the easement; there was no act or series of acts indicating a purpose to repudiate ownership." The chancellor, therefore, held that Brent did not abandon his easement.
¶ 35. Because we find that there was substantial evidence to uphold the chancellor's finding that Brent did not abandon his easement, we find no error and affirm on this issue. See Boggs, 379 So.2d at 522 (stating that if a chancellor is manifestly wrong in his or her fact-finding, then the Court must reverse).

CONCLUSION
¶ 36. Because there was substantial evidence to support the chancellor's judgment for Brent on both issues, we affirm the chancellor's finding that Brent's easement had neither been adversely possessed by Stone, nor abandoned by Brent. See Sanderson, 824 So.2d at 625-26(¶ 8) (stating that the appellate court will not disturb a *457 chancellor's findings if they are supported by substantial evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard).
¶ 37. THE JUDGMENT OF THE CHANCERY COURT OF WASHINGTON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.
NOTES
[1] Because Edwin Lea Brent is the creator and manager of the Trust, for the sake of clarity, "Brent" will be used to refer to both Brent and the Trust throughout the rest of this opinion.